UNITED STATES DISTRICT COURT
FOR THE
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-20447-CR-SINGHAL

UNITED STATES OF AMERICA

vs.

BENJAMIN FORREST MCCONLEY,
Defendant.
_____/

## BENJAMIN FORREST MCCONLEY'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE

The Defendant, BENJAMIN FORREST MCCONLEY ("McConley"), through undersigned counsel, respectfully submits this memorandum in aid of sentencing to assist the Court in fashioning a sentence that is "sufficient, but not greater than necessary" to fulfill the federal sentencing requirements of 18 U.S.C. § 3553(a). Through this pleading and based on several factors, McConley seeks to supplement the background information contained in the PSR, and respectfully requests that the Court consider imposing a below-guidelines sentence.

**Charges and Convictions**

On October 25, 2019, McConley pled guilty to conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349. The offense has a statutory maximum penalty of twenty (20) years. The advisory guideline imprisonment range is 151 to 188 months.[1] Sentencing was originally scheduled for January 17, 2020, just before the onset of the COVID-19 pandemic. Currently, sentencing is scheduled for September 14, 2021.

---

[1] The Defendant has reflected on the previously filed objections that were filed almost 21 months ago and has since withdrawn said objections. Despite enhancements noted in PSR based on the number of victims and the Defendant's role in the offense not being contemplated in the plea agreement, Mr. McConley stipulates that the Government would meet its burden by a preponderance of the evidence for said enhancements.

## Sentencing Factors under 18 U.S.C. § 3553(a) and the
## U.S. Sentencing Guidelines

McConley understands and agrees that federal sentencing law requires the Court to impose a sentence that is reasonable and that the Court must consider the Sentencing Guidelines in determining that reasonable sentence. As this Honorable Court is aware, a sentencing Court must follow the three-step process set forth by *Gall v. United States*. First, the Court properly determines the guideline range. Second, the Court determines whether to apply any of the advisory sentencing guidelines' departure policy. Third, the Court considers all the factors set forth in 18 U.S.C. § 3553(a) as a whole, including whether a variance is warranted. The result of the Court's three-step analysis is, after making an individualized assessment, to fashion a reasonable sentence that is "sufficient, but not greater than necessary," to fulfill the federal sentencing requirements of 18 U.S.C. § 3553(a).

*United States v. Hammons,* 558 F.3d 1100 (9th Cir. 2009) (district court must consider, but is not bound by, the applicable guideline sentencing range). A reasonable sentence that is "sufficient, but not greater than necessary," under 18 U.S.C. §3553(a), is the lowest possible sentence that accounts for all of the relevant statutory factors. Those statutory factors include: (1) The nature and circumstances of the offense and the history and characteristics of the Defendant; (2) The need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the Defendant; and (D) to provide the Defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the Guidelines range; (5) policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparity among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. See 18 U.S.C. §3553(a).

Once the Court considers the totality of the information provided herein, as well as further details to be expounded upon at the upcoming sentencing hearing, it is our hope that this Honorable Court sees fit to impose a sentence substantially below the advisory guidelines, as recommended in the PSR in this case.

**Nature and Circumstances of the Offense**

McConley and others offered to provide financing to producers seeking to produce movies and other projects. Regrettably, McConley and others deceived the victims through false and fraudulent documents. [See PSR ¶ 76] In doing so, McConley and co-conspirators caused a loss totaling approximately $60 million. [PSR ¶ 62]

Should the Court adopt the guidelines as set forth in the PSR, then McConley's sentence is enhanced by four (4) levels for having an aggravating role in the offense. Given that Rafael was granted a *four-level reduction* for his role in the offense, this creates an unwarranted sentencing disparity with co-defendant Benjamin Rafael, who was sentenced on July 13, 2021, to 30 months imprisonment (see below):

|  | McConley PSR | Rafael Plea Agreement |
|---|---|---|
| Base Offense Level (§ 2B1.1(a)(1)) | 7 | 7 |
| Actual Loss > $25 million (§ 2B1.1(b)(1)(L)) | +22 | +22 |
| Number of victims > 10 (§ 2B1.1(b)(2)(A)) | +2 | +2 |
| Sophisticated means (§ 2B1.1(b)(10)(C)) | +2 | +2 |
| Role adjustment (§3B1.1(a)) | +4 | ***-4*** |
| Acceptance of responsibility (§3E1.1) | -3 | -3[2] |
| TOTAL OFFENSE LEVEL | 34 | 26 |

As stated by the Government in its response to Rafael's Motion for Downward Variance and Sentencing Memorandum (D.E. 133), while Rafael's involvement spanned a shorter period of time, Rafael's participation included such egregious acts as lying to victim investors about the security of their money. As a banker at one of the largest, most highly respected and reputable financial institutions in the country, he was in a unique position to do so. During the short time he was involved, Rafael contributed in a vast and significant way to the success of the fraud. Rafael enabled the theft of *well over $50 million* from numerous investors, and did so by utilizing his position as a banker at a renowned institution.

---

[2] Due to Rafael's commission of an offense while on bond in this case, the Government recommended -2 instead of -3 under §3E1.1, in its sentencing memo, D.E. 133.

Despite Rafael's involvement spanning a shorter period of time, it is important to point out the amount of funds that Rafael assisted in fraudulently obtaining made up approximately 75% to 80% of the overall fraud. Therefore, it is axiomatic that Rafael aided in securing the majority of the fraud proceeds. In essence, the overall fraud was not distributed evenly or proportionately throughout all the years McConley was involved. This conclusion becomes evident upon examining each of the deposits in which or when Rafael was involved in the offense, and cross referencing those amounts against the victim list and the Bates Stamp information, amongst other facts. Of the funds reflected in the table below, the large majority of those came in after April 1, 2015, when Rafael was the sole and exclusive banker at Wells Fargo with whom McConley and VanEman worked with. Both prior to and subsequent to April 1, 2015, Rafael confirmed and discussed with victims as to funds that had already entered the bank. For example, Rafael confirmed to 222 that their funds were in the accounts and being worked on, when in actuality, they were not.

Based on what is illustrated below it is conservative to say Rafael's involvement accounts for at least $53 million of the estimated $60 million fraud for his role in the following:

| **Victim** | **Loss** |
|---|---|
| Superhuman | $3 Million |
| Dane Miller: | $1 Million |
| SSC | $2.5 Million |
| SSC | $3 Million |
| Adana | $15 Million |
| Adana | $13 Million |
| Land Run | $3.6 Million |
| Urge | $4 Million |
| Baker Film | $1.5 Million |
| Conroy | $700,000** |
| 888 | $2 Million |
| 222 Auty | $2 Million** |
| Urge | $2 Million ** |

(Note: the two asterisks (**) denote projects that sent funds prior to Rafael's formal involvement, yet he communicated or represented their funds were available once he would officially become the primary bank contact and bank representative.)

Upon comparing the bottom of the guideline range noted within the Presentence Report for McConley at an offense level 34 (with a criminal history category I), 151 months; to the bottom of a level 26 (CHC I) for Rafael, 63 months - the difference is a massive **88 months or 7 years**. This difference completely overstates the disparity in the role of McConley versus that of Rafael. Consider further a comparison of McConley's low-end guideline recommended sentence of 151 months to the *sentence imposed* on Rafael, 30 months. There, the difference is **121 months or 10 years.** Either way, this creates an enormous sentencing disparity between co-defendants in this case. McConley's sentence should not be 10 years more than that of his co-defendant as a comparison of their guidelines would suggest.

## History and Characteristics of the Defendant

### *PERSONAL AND FAMILY DATA*

McConley, age 39, was born and raised in the small town of Alexandria, Louisiana - home to a population of about 45,000 residents. As a child, McConley grew up in a Pentecostal Christian home, and resided with his biological parents. McConley's upbringing was respectable: his father worked as an architect, and his mother was a special education instructor. Despite McConley's parents divorcing once McConley was an adult, his parents put their best efforts toward keeping the family unit intact for their childrens' sake.

Within the small Louisiana town, McConley and his family attended the local church several times a week, to include choir practice. In his youth, McConley was free from experiencing any form of abuse, nor did he witness any domestic violence in his household, which was kept free of alcohol and illegal substances. In short, McConley was raised in a warm and loving environment. McConley pursued his passion for athleticism in his high school years, and was named captain of the basketball team. Said team was comprised of students representing a cross-section of the local community, with whom McConley developed close ties and maintained a harmonious, friendly relationship with. Following his high school graduation,

McConley attended Louisiana State University (LSU), where he consistently made the Dean's list based on his academic achievements.

Notably, from 2002 to 2004, McConley worked in the Financial Department of the Louisiana State Legislature. This employment entailed working in accounts receivable/accounts payable, to assist state representatives and senators in processing their *per diem* checks. McConley received an employee appreciation award from the state legislature for all of his efforts. During the legislative sessions, McConley assisted the offices of Representative Charles Dewitt and (then) Senator Bobby Jindal, who went on to become the governor of Louisiana. In 2005, the Defendant continued his post-graduate studies at Florida State University (FSU) in Tallahassee, Florida. In 2007, McConley earned a master's degree in business administration from FSU.

McConley then went on to perform consulting services at and handled the insurance aspect of his family's business, Specialized Supports and Service, located in Tallahassee. In the years to follow, McConley became an insurance broker in both Florida and Louisiana. As noted in paragraph 152 (formerly 136) of the PSR, McConley's career in the insurance industry lasted from 2008 until 2015, at which time he began offering financing options to film producers.

### *MEANINGFUL CHARITABLE AND/OR VOLUNTEER SERVICE*

During his early years, McConley was a Pentecostal church youth choir member and volunteer who attended church youth camps during the summers. McConley was also an avid reader of scripture, and excelled as a bible school student. From childhood through his college years, McConley participated in the well-known, long-running annual church production, "Messiah," for the Pentecostals of Alexandria. While in high school, McConley assisted food banks by serving warm meals to individuals in need, and devoting his time to delivering turkeys for several families not only during the holiday season, but during such times of natural disasters. Hurricanes often left a wake of destruction in impoverished local communities with already-limited resources, and McConley assisted in providing relief to less fortunate individuals during times of crisis.

While attending LSU, McConley helped serve as a mentor for prospective or future professional athletes by providing them with tutoring services, and helping

them prepare for college life. Generously, McConley provided some of the athletes with food, clothing and transportation services, by his own accord. This selfless act afforded these students with the ability to attend football camp. It is also important to note that McConley is a former Florida Chapter Leader with the LSU Tiger Athletic Foundation. While attending college, McConley also served as a little league volunteer coach for his younger brother's team, which was coached by their father.

While in Tallahassee, McConley worked on a part-time basis and/or as a volunteer for the Agency for Persons with Disabilities, through his family's Tallahassee-based business, Specialized Supports and Services. McConley's stepmother owns the business, which has a contract with the Agency for Persons with Disabilities. While he worked/volunteered for this agency, McConley served as a home health supervisor or "Supported Living Coach," and developed close relationships with intellectually disabled people. McConley assisted in taking these individuals to several locations such as grocery stores in order to aid them in furthering their social skills. McConley also helped these individuals develop some personal, basic daily living skills, spending time and a great deal of care in teaching them to do such things as dress themselves, tie their shoes, personal grooming and learning to cook.

McConley worked diligently in directly carrying out the agency's goal, which was to help disabled individuals with training and home health care so that they would become independent, preventing them from being institutionalized. McConley made such a personal connection with some of the students, with whom he continued to maintain contact throughout the years. In fact, some have recently inquired and/or wondered about his current whereabouts, as he has been incarcerated (*See Notice of Filing Letters of Support wherein a heartfelt message and holiday card written by two intellectually disabled persons with whom he has maintained contact throughout the years*).

Notably, McConley was inspired by his mother and sister, who devoted their lives to their respective careers in special education. McConley's sister, who obtained her Ph.D., is now working as a school principal. McConley's family has provided services to the Agency for Persons with Disabilities and/or Florida Department of Children and Families for over 25 years through Specialized Supports and Services.

### *POST-ARREST VOLUNTEER WORK AND ASSISTANCE TO FELLOW INMATES AT THE DETENTION CENTER*

Since his arrest in August 2019, and while incarcerated at the Federal Detention Center (FDC) in Miami, Florida, McConley has dedicated his time to worthy causes to benefit his fellow inmates and staff at the facility. McConley was named the Head Orderly – Trustee at the FDC Miami.  He has been deemed his jail unit's Team Leader, and works with Case Managers and Counselors at the jail. McConley volunteers for the FDC's Education Department by reading and helping inmates understand the language contained in indictments, plea agreements and sentencing computation sheets. Additionally, he assists the department by teaching a basic business course to inmate students. The course includes topics such as accounting, economics and marketing. McConley also assists fellow inmates in creating resumes and preparing them for the General Education Development (GED) examination so they can later obtain their high school equivalency diplomas. McConley has been mentoring and assisting inmates by writing letters for over 300 fellow prisoners. This correspondence consists of letters written to attorneys, the probation office, (federal) judges and civil courts, government representatives and the Federal Bureau of Prisons. McConley has led the chapel for Christian Services and has been actively involved in the Prisoner Bible Drive.  By seeking the support of family and friends, McConley has obtained over 150 bibles for inmates who wish to seek a spiritual path.  Unfortunately, through no fault of his own, many of these volunteer services came to a halt, or were minimized, in early-March 2020, because of the FDC's lockdown procedures implemented as a result of the Covid-19 pandemic.

### *FAMILY STABILITY WILL HELP HIM ADJUST TO POST-INCARCERATION LIFE*

McConley has expressed to his father that he wishes to resume studying law once again and/or working at a law firm after he is released from imprisonment. Notably, McConley attended one semester of law school at Nova University but opted to put this dream on pause when he and his first wife elected to pursue starting a business.

McConley's father describes his son as a sensitive, kind-hearted person who would often show empathy for others. For this reason, McConley's father expressed

8

that his son's involvement in the instant fraud conspiracy was something "totally out of character for him." He did note a change in his son's behavior approximately one year prior to his arrest. During that time period, he discovered his son had been rushed to the emergency room on more than one occasion for a heart condition and elevated blood pressure. He counseled his son to slow down with work and his fast-paced lifestyle he was leading in Miami.

As a direct result of McConley's behavior, the Defendant and his wife were headed towards divorce at the time the PSR was prepared in late 2019 (Paragraph 129, formerly 113). Since that time, Mr. and Mrs. McConley have reconciled their marriage. In her open letter to the Court, Mrs. McConley notes that she has witnessed a "transformation" in McConley since his arrest and "can hear it in his voice."

Mrs. McConley is looking forward to and eagerly anticipating the day that McConley can return to their home in Miami, Florida, so that McConley, his wife, and their two (2) daughters can resume their time together as a family.

In addition to letters of support written by McConley's wife and stepdaughter, several other individuals central to McConley's life have written letters of support on his behalf and anxiously await his release, to wit: McConley's mother, father, stepmother, sister, and other beloved family members, friends and mentors.

### *DEFENDANT'S EARLY EFFORTS TO COOPERATE*:

From the very beginning, McConley cooperated with authorities. McConley never sought bond, as he was ready to accept responsibility and begin serving his time for his involvement in the instant fraud conspiracy. In fact, McConley was the first person implicated in the conspiracy to be interviewed by federal agents and begin assisting the Government immediately after his arrest on August 19, 2019. McConley has been debriefed on several occasions, identified numerous documents, and reviewed evidence with agents to assist them in their ongoing investigation.

As per the Plea Agreement, McConley reviewed hundreds of Bates stamps and provided context to hundreds of emails/text messages/communications, further

clarifying information in his efforts to assist the Government in their investigation. McConley should be rewarded for his exhausting cooperation efforts and credit, as well as his overwhelming willingness to go above and beyond just pleading guilty. McConley spoke to agents on several occasions, early on, as opposed to challenging the Government and waiting to be provided with discovery.

Due to the COVID-19 pandemic (an unforeseeable consequence), McConley and the Government have not been able to meet in person to further provide the Government substantial assistance. However, McConley did not sit idle during this time. McConley continued reviewing discovery and forwarded hundreds of Bates stamps to the Government. Through no fault of either party, the pandemic has created an insurmountable obstacle to overcome. For purposes of sentencing, said obstacle is a substantial detriment to McConley in his good faith efforts to continue to provide substantial assistance to the Government that would rise to a §5K1.1 motion.

A Defendant's assistance to authorities in the investigation of criminal activities has been recognized in practice and by statute as a mitigating sentencing factor. U.S. District Court Judge Robert N. Scola is one among several judges in the Southern District of Florida who acknowledge and reward defendants, in the form of a downward sentencing variance pursuant to 18 U.S.C. § 3553, for their efforts to cooperate even when their assistance does not meet the perceived definition of "substantial" in the eyes of the government. It should be noted that until very recently, the Covid-19 pandemic had been preventing prosecutors and/or agents from having in-person interviews and debriefings with defendants, proving to be a hindrance for McConley and other similarly situated defendants. McConley is ready and willing to continue his cooperative efforts to assist the Government. McConley's cooperation also demonstrates his positive character and his efforts to make amends for his misconduct.

In case number 8:11-cr-00389-JDW-TGW-1, before Judge Whittemore in the Middle District of Florida, defendant Terrill LaDaja Gainous ("Gainous"), whose advisory guideline range was from 188 to 235 months, was given **a significant downward variance of 58 months based on his willingness to cooperate**. In that case, Mr. Gainous (unlike McConley) was unable to provide any assistance to the Government because the other involved participants whom he knew had already been sentenced or pled guilty. The Eleventh Circuit affirmed the

10

variance was reasonable in that the district judge "considered the totality of the circumstances and the 18 U.S.C. § 3553(a) factors, and adequately considered mitigating evidence." *United States v. Gainous*, 546 F.App'x. 914, 915 (11th Cir. 2013).

*United States v. Robinson,* 741 F.3d 588, 599 (5th Cir. 2014) [A] sentencing court has the power to consider a defendant's cooperation under § 3553(a), irrespective of whether the Government files a §5K1.1 motion.

### *SEVERE JAIL CONDITIONS DURING LENGTHY PRETRIAL DETENTION DUE TO COVID-19 PANDEMIC AND HIGHER RISK OF CONTRACTING COVID-19 AND/OR DEATH IF LENGTHY PRISON TERM IMPOSED*

As a result of the unprecedented COVID-19 pandemic and various safety precautions imposed at FDC Miami to prevent the spread of the potentially deadly virus, McConley has been on "lock-down" for 18 months, and is allowed out of his cell for only one (1) hour per day. Prior to that, he was actively involved in many tasks and volunteer services, many of which have been canceled or restricted due to the pandemic.

Specifically, McConley has been in pretrial detention since August 16, 2019. Since March 13, 2020, BOP "modified its operations" to respond to the spread of COVID-19. Since then, and for approximately eighteen (18) months, McConley has been in basic lockdown conditions akin to those enforced for inmates in **solitary confinement**. Individuals in every institution are secured in their assigned cells/quarters to decrease the spread of the virus. Although movement exceptions are made to permit showers, telephone and email access, commissary, and laundry, in reality even those basic activities are not always allowed, and instead, conditions amount to a lockdown for almost 24 hours a day. For the first 10 of these 18 months in question, McConley and other inmates were allowed to leave their cells only three times per week, for 15 minutes at a time (***45 minutes in total per week***). The rules were later modified to allow for 30 minutes per day, three times per week and progressively became 2 hours per day; however, they are completely locked down once again. The Defendant does not get any fresh air, has not been exposed to sunlight, and cannot exercise outside the cell or go walking.

While these conditions are necessary to prevent the spread of a deadly disease, they do not reflect a typical experience for a federal inmate who has not

11

been sanctioned and placed in a special housing unit (SHU). McConley has not been able to embrace or show meaningful affection to his wife and their child for over 19 months, as they are separated by a glass partition during contacts. The Defendant's child from another relationship was relocated to Hawaii during his detention, and he has had no contact with his daughter for the entirety of his incarceration.

Historically, McConley has suffered from a cardiac condition, high blood pressure/hypertension, sleep apnea (which requires a CPAP machine that is not permitted to be used within the facility) and a chronic back/spinal condition, which have all taken a toll on McConley's health. Due to McConley's well-documented medical history, he presents a high risk of experiencing serious medical complications, or even death, if he is exposed to COVID-19. The probability of exposure if McConley is given a lengthy term of incarceration is real and substantial, as the BOP has continually reported cases of COVID-19 in its facilities, and has limited ability to take necessary precautions to minimize the spread of the virus. McConley's current incarceration conditions, given all of the risks and complications associated with COVID-19, are significantly more severe than those endured by inmates who were incarcerated prior to the onset of the pandemic. This Honorable Court should consider these conditions when fashioning a fair sentence for McConley.

This Court has the authority to depart from the sentencing guidelines in "exceptional" circumstances, which the guidelines have not adequately taken into account. The COVID-19 pandemic and McConley's unique medical conditions are precisely such grounds.

U.S.S.G. § 5K2.0 provides the sentencing court may downwardly depart from the applicable guideline range if the Court finds, pursuant to 18 U.S.C. § 3553(b)(1), that there exists an aggravating or mitigating circumstance. In addition to the specifically enumerated grounds for departure, however, the Court may also depart from the recommended guideline range of imprisonment where "in the exceptional case" there is "present a circumstance that the commission has not identified in the guidelines but that nevertheless is relevant to determining the appropriate sentence." McConley's case presents an exceptional set of facts to warrant departure from the stated guideline range. Without question, the COVID-19 pandemic is unlike any global crisis the world at large has ever seen. The judiciary has not been blind to the novel virus, nor the heightened risk facing

inmates and incarcerated offenders given the specific and devastating effects of the virus. In fact, numerous District Courts across the country have granted early release (compassionate release), bond, or relief from incarceration in light of COVID-19.

McConley would respectfully ask this Honorable Court to consider these conditions and other factors presented in this memorandum in granting a reduction in his sentence.

## *RECIDIVISM IS IMPROBABLE BASED ON HIS PERSONAL CHARACTERISTICS AND RECENT STUDIES*

Several of the factors that the Court must consider when fashioning an appropriate sentence are as follows: promotion of respect for the law; just punishment for the offense; adequate deterrence to criminal conduct; and protection of the public from further crimes of the Defendant.

McConley, who is 39 years old and approaching middle age, has a lower recidivism and/or "rearrest" rate than most of his fellow federal offenders for several factors, including his age, his criminal history (category) and the nature of his offense.

In December 2017, the U.S. Sentencing Commission published the results of its in-depth research and study, The Effects of Aging on Recidivism Among Federal Offenders. According to Part 5 of the aforementioned publication, the reconviction rate is highest among offenders younger than 21 (48.5%) and those between the ages of 21 to 24 years old (48.4%), but declined in each subsequent age group. The reincarceration rate was highest among those between the ages of 21 to 24 years old (38.6%) and declined in each subsequent age group. Specifically, reincarceration rates for offenders between the ages of 40 and 59 ranged from as low as 9 percent (for those aged 55 to 59) to 23 percent (for those from age 40 to age 44).  Based on these facts, it is unlikely this Defendant will become involved in criminal activity after he is released from prison on the instant fraud conviction.

As to prior criminal history, McConley is in the lowest possible criminal history category of I, as a result of having zero criminal history points. Moreover, he is among offenders that present one of the lowest risks to re-offend.

The U.S. Sentencing Commission conducted a recent study which demonstrated that offenders with zero criminal history points have a lower recidivism rate than offenders with one criminal history point. [*See Tracey Kyckelhahn & Trishia Cooper, U.S. Sentencing Commission, The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders at 6–9 (2017)*]. The Commission found substantial differences in recidivism rates among Criminal History Category I offenders (which includes offenders with a criminal history score of zero or one point). In general, less than one-third (30.2%) of Criminal History Category I offenders with zero points were rearrested while nearly half (46.9%) of offenders with one point were rearrested. The Commission has found offenders with zero points but some prior contact with the criminal justice system (as opposed to no contact at all) have a rearrest rate of 37.4%.

The statute itself suggests terms of imprisonment are not always appropriate for first offenders without any convictions and with no violent or serious crimes in their background. Title 28 U.S.C. § 994(j) even references the "general appropriateness of imposing a sentence other than imprisonment" for "a first offender who has not been convicted of a crime of violence or an otherwise serious offense," yet the general appropriateness of imposing a term of imprisonment on a person convicted of a crime of violence that results in serious bodily injury.

It is worth mentioning that one of the goals of The First Step Act of 2018, which was signed into law on December 21, 2018, was to reduce the size of the federal prison population while also creating mechanisms to maintain public safety. The First Step Act has required the Department of Justice (DOJ) to develop a risk and needs assessment system to be used by the Federal Bureau of Prisons (BOP) to assess the recidivism risk of all federal prisoners. It was determined by McConley's case manager that his risk assessment was the lowest possible level. As such, McConley would be eligible for maximum amount of home confinement under the First Step Act.

A term of imprisonment of approximately 48 months, or 4 years, would not only achieve that goal and be much less costly for taxpayers, but also sufficient for this non-violent, first-time offender. A sentence within that suggested range could also allow him to begin making some payments toward his restitution obligations, since under that suggested outcome, he would still be relatively young (mid-40s) when released from prison, able to earn an income and begin paying back some of his restitution obligations. In addition, as the suggested sentence would be

substantially more than what co-defendant Rafael received (30 months), it would not create any disparities among codefendants.

It should also be noted that McConley has a very solid family support system; has earned a bachelor in science degree from Louisiana State University (where he was named on the Dean's List); earned a master's degree in business administration from Florida State University in December 2007; and has employment opportunities awaiting him upon his release from imprisonment. His unique business skills, achievements in higher education and attentive family unit, propelled by his remorse and his desire to make positive contributions to the local community are factors that will enable McConley to easily become a productive member of society once he exits the federal prison system.

*Conclusion*

The Court has the discretion to consider a variance under the totality of the §3553(a) factors, rather than one factor in isolation. Based on all the aforementioned factors, which include the following: McConley immediately accepting responsibility; never requesting bond; the need to avoid any sentencing disparities among codefendants; the Defendant's efforts to cooperate immediately with the Government and agents upon being arrested; his solid family support and all the volunteer service he has done in the past and the present; the lockdown conditions he has endured as a result of being a federal inmate during the pandemic and the risk of contracting COVID-19 associated with receiving a lengthy prison sentence; and the unlikelihood of recidivism based on his background, we suggest that a sentence well below the advisory guideline imprisonment range is not only appropriate and sufficient, but necessary. In fact, a shorter sentence would be more in tune with the First Step Act, the aim of which is to do away with the approach of locking up non-violent, first-time offenders for decades.

Therefore, **a sentence of 48 months, or 4 years**, would still adequately promote respect for the law and constitute just punishment for the offense, would still be significantly higher than the sentence imposed on his co-defendant, Rafael; would deter McConley from involving himself in any future criminal conduct; and would allow McConley to serve sufficient time in prison while still being released within a reasonable period of time in order to become a productive citizen and begin working to try to make his victims whole.

WHEREFORE, the Defendant respectfully urges this Honorable Court to consider the aforementioned sentencing factors and letters of support submitted, and impose a sentence below the advisory guideline range as suggested.

Respectfully submitted,

**REYNOSO ERICKSON TRIAL LAW, P.A.**
1801 NE 123rd Street, Suite 314
North Miami, Florida 33181
Phone: (754) 216 – 4981

By: /s/ Luis E. Reynoso
Luis E. Reynoso
Florida Bar Number 0864021
Luis@reynosoerickson.com

/s/ Robert M. Erickson
Robert M. Erickson
Florida Bar Number 0107326
Rob@reynosoerickson.com